UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

- V. -

DARNELL FEAGINS,

DEFENDANT.

20 Cr. 218 (ALC)

---

**SENTENCING MEMORANDUM**

ZMO Law PLLC
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999
zach@zmolaw.com

*ATTORNEYS FOR DEFENDANT DARNELL FEAGINS*

## TABLE OF CONTENTS

FACTS ................................................................................................2

    I.   DARNELL FEAGINS'S HISTORY AND CHARACTERISTICS...........................2

        A.   ██████████████████████████████████████
                                                      .................................2

        B.   ████████████████████████████████. ...............................5

        C.   As a young man, Darnell worked, took care of his mother, and got arrested many times.................................................................................7

    II.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ............................9

CALCULATIONS UNDER THE ADVISORY U.S. SENTENCING GUIDELINES ........10

PROPOSED MONETARY PENALTIES ....................................................10

RELATED VIOLATION OF SUPERVISED RELEASE.............................................11

ARGUMENT ........................................................................................11

    I.   LENIENCY IS WARRANTED BECAUSE ███████████████████
        ████████████████████.....................................................12

    II.  THE "ECCENTRIC" CHILD PORNOGRAPHY POSSESSION GUIDELINE SHOULD BE GIVEN MINIMAL WEIGHT BECAUSE IT PRODUCES UNREASONABLE RESULTS. ......................................................13

CONCLUSION ....................................................................................21

At 35, Darnell Feagins has nothing: no family, no home, no money, no relationships, no freedom for at least ten years, and no independence from the United States Probation Department for the rest of his life. He does not know his real name. He does not know who his biological parents are. He was ███████████████████████████ ████████████████ █████████████████████████████ ████████████████████████ The woman who raised him, and her sister who helped, both died since Mr. Feagins was jailed on this case in 2020. There is nothing left.

Mr. Feagins now faces a federal sentence of incarceration of ten-to-twenty years, an existing lifetime of supervised released imposed by the Hon. Richard J. Sullivan, up to two years consecutive incarceration for a related violation of supervised release, lifetime sex offender registration, and crushing financial penalties that will ensure he remains impoverished for years to come. The Department of Probation acknowledged that the provision of the United States Sentencing Guidelines governing Mr. Feagins's offense is irrational, but nonetheless recommended a Guidelines sentence of imprisonment, which would be 130 months, ten months above the statutory minimum. As discussed below, the courts have noted that the child pornography guideline is "of highly unusual provenance" and "can easily generate unreasonable results." *U.S. v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010). We respectfully submit that the 130 months in prison recommended by the Sentencing Guidelines in this case would be unreasonable, and that a total of ten years in prison is ample in light of the other sanctions and personal losses Mr. Feagins has suffered.

## FACTS

The following facts are drawn from the Presentence Investigation Report dated May 24, 2023 ("PSR"), files provided by prior counsel, conversations with Mr. Feagins, and our own investigation.[1]

### I.   Darnell Feagins's History and Characteristics

**A.**   

A baby who would later be given the name Darnell Feagins was born on ███ ███ at Beth Israel Hospital to a ███████████████████████. Records from the social work agency that handled his case, Little Flower Children and Family Services of New York ("Little Flower"), reveal that the little boy was ████████ ████████████████████." Ex. A: Little Flower Records at 2.[2] ████████

████████████████████████████

---

[1] With respect to the PSR, we respectfully request that the narrative at ¶ 57, and that all but the first three sentences of ¶ 82 be stricken. As to ¶ 57, Mr. Feagins denies any violent or forcible conduct; the guilty plea was based solely on the victim's inability to consent due to her age. As to ¶ 82, there is no scientific basis for the listed conclusions about Mr. Feagins's character and personality, which amount to name-calling by the evaluator, serve no purpose as part of the PSR, and will only make Mr. Feagins's time in prison needlessly more difficult.

[2] These records were obtained from Little Flower in the course of our defense mitigation investigation. They have been redacted by the agency to conceal Mr. Feagins's true identity. Our office has been attempting to obtain an original, pre-adoption birth certificate for Mr. Feagins authorized by a New York law passed in 2019, in order to identify his birth parents. Our efforts have so far been unsuccessful, but we are hopeful that a certificate will be forthcoming shortly from the City of New York.

███████████████████████████████████████████████████████████

███

      The child's biological father was described as a former ████████████████████

████████████████████. Ex. A at 42. As of January 7, 1988, the father had been

on welfare for the previous two years. The social worker assigned to the case described

her general impression of the birth father as seeming like "he started deteriorating in the

past few years- he blames ██████." He had a "vivid imagination" and it seemed possible

that he was ███████████. His behavior seemed inappropriate at times: he giggled a

lot, got upset easily for no reason, but also calmed down suddenly. *Id.* at 45. The birth

father would frequently disappear for months at a time. In May 1988, the baby's paternal

grandmother reported that she had not seen her son in more than three months. Ex. A at

56.

      The baby was placed in a foster home shortly after his birth. There is some

indication he was named Anthony. His original foster mother had a three-year-old son and

the new baby seemed to get along well with the family, but this first foster mother decided

not to adopt him after she learned that she would not receive financial subsidies after the

adoption was finalized. The foster mother worried about how she would support an

additional child and worried that he would grow up "with the problems of the street." *Id.*

86.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

In October 1988, Little Flower Children's Services placed the child in the pre-adoptive home of Bridgette Feagins. Ex. A at 93. Bridgette named him Darnell and gave him her last name. According to the records, Bridgette lived in a spacious home and had a closet full of baby clothing for Darnell. *Id*. at 97. She took maternity leave from her job to help Darnell adapt to his new home. *Id.* at 99. Darnell was not legally freed for adoption when he was first placed with Bridgette, but attorneys at Little Flower worked on having Darnell's birth parents' rights terminated so Bridgette could legally adopt him. *Id.* at 100.

The records claim that Darnell's birth mother never contacted the agency after Darnell's birth. Darnell's birth father visited Darnell occasionally, so it was up to the court to decide if his parental rights would be terminated. Ex. A at 102. On March 27, 1989, Darnell's birth father's parental rights were terminated due to "permanent neglect," failure to visit Darnell, and failure to complete the agency's parent training program. Ex. A at 110. On May 11, 1990, Bridgette Feagins legally adopted Darnell Louis Feagins at the Brooklyn Family Court with Judge Sara P. Schecter presiding. Ex. A at 140.

As reflected in the PSR, despite the successful adoption placement, Mr. Feagins's childhood was troubled by ██████████████████████████████████. Darnell was Bridgette's only child, but money was tight. PSR ¶ 67. There was not always enough to eat or adequate clothing. Utilities were turned off at times. Bridgette rented out rooms

in the brownstone apartment building in Brooklyn where they lived but was evicted when Darnell was 15. *Id.* She was an active member of a local church.

There was also conflict and resentment over the circumstances of Darnell's adoption from a very young age. ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████. He yearned to know more about his birth parents, but Bridgette was reluctant to discuss them and it is not clear whether the information she provided about them was accurate.

**B.      Darnell was repeatedly ███████████████████.**

Bridgette Feagins died in August 2021, while Darnell was in jail on this case. A letter she submitted in connection with his 2018 sentencing before Judge Sullivan is submitted herewith as Exhibit B. Bridgette was from Georgia and would frequently take Darnell there to visit her extended family, including her sister, Katrina. Not long after Darnell learned he was adopted, ████████████████████████████████████

███████████████████████████████████████████████████████

█████████ ████████████████████████████████████████████████████████████████ .

*See* PSR ¶ 73.

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████

After the eviction, Darnell resided with various family members and no longer lived with his mother consistently. After staying with an uncle in Brooklyn, he moved back and forth to Georgia and sometimes stayed with his godfather in New York. He always had a good relationship with his godfather, who took him for haircuts or out bowling. PSR ¶ 69.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████

---

[3] The two men who ████████████████████████████████████████████
████████████████████████

**C.** **As a young man, Darnell worked, took care of his mother, and got arrested many times.**

Darnell never stayed long in one place after his mother was evicted from the Brooklyn brownstone. He moved back and forth between Georgia and New York and often slept in his car. He stayed with his aunt Katrina in Georgia. He was arrested frequently for minor infractions like reckless driving. Katrina kicked him out when he turned 18 but would sometimes let him park in her driveway to sleep and use the shower. He worked at Family Dollar and, for several years at Applebee's restaurants in both New York and Georgia. PSR ¶ 75.

None of the arrests was particularly serious except for the sex offense: criminal sexual act in the second degree and endangering the welfare of a child based on a sexual encounter with a girl too young to consent when Darnell was 24.[4] His frequent incarceration and federal prosecutions since that time all arise out of that incident. He absconded from parole, failed to register as a sex offender, and was charged and imprisoned by the federal government for interstate failure to register. As detailed in the PSR, the failure to register gave rise to the violation of supervised release and the search of his phone that led to the instant charges and additional pending supervised release violation proceeding before Judge Sullivan.

---

[4] In its recommendation, the Department of Probation refers to the instant offense as Feagins's "third conviction for a sex offense." PSR at 35. That is not accurate. While the criminal sexual act conviction is surely a sex offense, failure to register and probation violations are *not* sex offense convictions. The instant child pornography offense is Mr. Feagins's second sex offense conviction, not his third.

When Darnell was in his early 20s and working at Applebee's, ███████████ ████████████████████████████████████████████████████ ██████████████ A friend (who happened to work as a corrections officer) sent Darnell a Greyhound bus ticket for the long ride from Georgia and he came back to New York to support her during her rehabilitation. He stayed with Bridgette's father in New York; ██ ████████████████████████████████████████████████████████ ██ .

**D.** **After his recent release, Darnell tried to come to terms** ███████████
█████████████████

In 2020, after Darnell was released for his failure to register, he went to live at a men's shelter. He looked for work and would play chess in the park in Harlem (our office has sent him several chess books at MDC). It was during this time that Darnell found the courage to tell his mother ██████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████ He was crushed by her lack of empathy. At the same time, Darnell he was just beginning to ████████████████████████████ ██████████████████████████████████ . As his therapist testified before Judge Sullivan, Darnell would participate in therapy by walking down the noisy streets of the Bronx with a cell phone pressed against his ear. *See* 3/28/2023 Hearing Tr. at 30-31.

As COVID got underway in the Spring of 2020, Bridgette's sister Katrina ███████ Darnell was still out of jail and Bridgette told him she was going to Florida. Darnell begged

her not to go, but she said she felt compelled. She took a Greyhound, by herself, █████ ████████████████████████████████████████████ What was supposed to be a few weeks with her sister dragged on for more than a year. Darnell was arrested in October 2020 on this case, when Bridgette was still in Florida. She never visited him in jail. ██ ███████████████████ and passed away from it in August 2021. Katrina died the following year, in November 2022. That left Darnell with no known living relatives, no family, no one to provide commissary money, no support at all. He nonetheless has endured stoically in jail, even under the atrocious lockdown conditions at the MDC. He was attacked and robbed by gang members who found out about his conviction. He did not fight back but was placed in protective custody. All of his property was taken and not returned. He is now in a stable unit at MDC and is looking forward to being transferred to a sentenced facility where he can participate in rehabilitative programming.

## II.   The Nature and Circumstances of the Offense

The PSR and plea agreement accurately describe the instant offense, which consisted of possession of child sexual abuse material on two cell phones. The first was recovered when Mr. Feagins was arrested in May 2018 for failure to register and contained about 1200 illegal files. The second was recovered after Mr. Feagins was released from custody, absconded, and was re-arrested in October 2022. The second phone contained 41 videos and 41 images. *See* PSR ¶¶ 13-21.

Mr. Feagins pled guilty to one count of violating 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), which provides a mandatory minimum sentence of ten years for possession of child

pornography for individuals previously convicted of a state crime relating to sexual abuse. Under the agreement, the government agreed not to further prosecute Mr. Feagins for possession of child pornography between November 2017 and October 2020. The agreement was struck between the parties after the government threatened to indict Mr. Feagins for *receipt* of child pornography, which would have increased the mandatory minimum sentence to 15 years under 18 U.S.C. § 2252A(b)(1).

### CALCULATIONS UNDER THE ADVISORY U.S. SENTENCING GUIDELINES

The PSR accurately calculates the Guidelines sentence based on USSG § 2G2.2 and Mr. Feagins's criminal history category of V. This calculation includes enhancements present in virtually every modern child pornography case including plus two for use of a computer (in this case, Mr. Feagins's cell phone) and plus five for more than 600 images.

### PROPOSED MONETARY PENALTIES

The PSR recommends imposition of an additional special assessment of $5000 based on the crime of conviction under the Justice for Victims of Trafficking Act, 18 U.S.C. § 3014. *See* PSR ¶ 102 and recommendation at pp. 33, 35 and 36. We object to imposition of this fine because the statute applies to only to "non-indigent" defendants. Mr. Feagins is indigent.

In addition, the government has indicated it will seek restitution on behalf of at least three victims in the amount of at least $9,000. While we have no basis to object to this levy, we note that it will have a devastating effect on Mr. Feagins, who does not even have access to hygiene products because, with no living family, he has no way to get money

into his prison commissary account. It will be years after his release before Mr. Feagins will be able to pay off the restitution in full, and having a restitution judgment hanging over his hear will hold him back in getting on with his life and putting his criminal past behind him. We ask that the Court consider the effect of mandatory restitution on Mr. Feagins in determining the length of the incarceratory sentence and set a realistic payment schedule that begins no sooner than five years after his release from prison.

<u>RELATED VIOLATION OF SUPERVISED RELEASE</u>

Mr. Feagins also faces a violation of supervised release pending before the Hon. Richard J. Sullivan under the caption *U.S. v. Feagins*, 17 Cr. 377 (S.D.N.Y.) for absconding in 2020. Mr. Feagins challenged the specifications. An evidentiary hearing was held and briefing was submitted; a decision on the violation specifications is pending. Judge Sullivan indicated at a court appearance that he did not intend to sentence Mr. Feagins on the violation until after he is sentenced in the instant case so that he (*i.e.* Judge Sullivan) would maintain the ability to run the violation of supervised release consecutive to any sentence imposed on this docket. Because we believe that the mandatory minimum is far too severe under the circumstances of this case, we also ask that this Court recommend that any sentence on the supervised release violation run concurrently with the sentence imposed here.

<u>ARGUMENT</u>

As discussed below, we ask that Mr. Feagins be sentenced to the minimum lawful sentence for his conviction: 120 months in prison followed by a term of supervised release

of five years. Despite the family difficulties, Mr. Feagins was a loyal son to his mother when she fell ill. He has adjusted well since his incarceration with no disciplinary infractions. PSR ¶¶ 5-6. He has no history of violence and has completed an anger management course. *See* Dkt. No. 17 Cr. 377, ECF No. 27 at 4 (RevCore Recovery Center Anger Management Program Certificate of Completion). He has proven he has the capacity to work and take care of himself despite the depredations of his childhood. While the advisory Guidelines sentence is a little bit higher than the requested ten-year sentence, we respectfully submit that 130 months in prison is greater than necessary to achieve the objectives of sentencing in light of the adverse experiences Mr. Feagins suffered in childhood, including ██████████████████████████████████████, and the eccentric origins of the child pornography guidelines. 18 U.S.C. § 3553(a). Additional supervised release is not necessary because Judge Sullivan has already sentenced Mr. Feagins to lifetime supervised release.

I.    **Leniency is warranted because of the** ██████████████████
██████████████

In 1802, the British poet William Wordsworth wrote that the "Child is the father of the Man[.]" He was talking about the delight a child takes in the world and how that can stay with a person throughout his life. But the converse is true here: the harms inflicted on Darnell were inflicted not just on a person in one moment, but have persisted for decades with the man Darnell has become. Darnell's possession of child pornography can be traced to the desensitization he experienced by ███████████████████████
████████████████████████████████████████████. His difficulties in

relationships stem from abandonment and loss of sense of self, identity, belonging, and pride of place. His poor decisions are directly attributable to what was done to him as a child. His father—in Wordsworth's construction—was a lonely, abused, fatherless, abandoned, ███████████ whose heart never had a chance to leap. *See* Wordsworth, William, "My Heart Leaps Up" (1802).

Darnell's adverse childhood experiences should inform the sentence in two ways. First, an extra ten months of suffering in federal prison is not warranted for someone who has suffered so much already. Second, the pain inflicted on him in childhood reduces his moral culpability for his crime, which was less a product of his individual will than of the lived experiences over which he had no control but that damaged his psyche. It is uncontroversial that adverse childhood experiences are criminogenic. *See, e.g.,* Reavis, et al., ADVERSE CHILDHOOD EXPERIENCES AND ADULT CRIMINALITY: HOW LONG MUST WE LIVE BEFORE WE POSSESS OUR LIVES, Perm J. 2013 Spring; 17(2): 44–48. In this case, Darnell's possession of child pornography was a direct product of his adverse childhood experiences and lack of guidance. While that does not excuse his conduct, it suggests that ten years imprisonment is more than sufficient punishment under the factors set forth in 18 U.S.C. § 3553(a).

## II. The "eccentric" child pornography possession Guideline should be given minimal weight because it produces unreasonable results.

A growing consensus has emerged that the Guidelines governing possession and receipt of child pornography are "fundamentally different from most" – they are far too high as a result of political manipulations that increased the applicable guidelines

sentences in most child pornography cases by a factor of ten. *See U.S. v. Dorvee*, 616 F.3d at 184-88; *see also* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (rev. Jan. 1, 2009), Appendix A, *available at* https://www.ussc.gov/sites/default/files/ pdf/training/annual-national-training-seminar/2016/report_stabenow.pdf (hereinafter "Stabenow") (showing increase in Guidelines sentences since enactment).

Despite political pressure for ever-increasing punishments on child pornography defendants, numerous courts around the country had taken this view even before 2010, routinely refusing to impose Guideline sentences in cases like Mr. Feagins's. *See, e.g., U.S. v. Diaz*, 720 F.Supp.2d 1039, 1042 (E.D. Wis. 2010) (finding the "guideline is largely the product of congressional directives, some of which the Sentencing Commission actively opposed, rather than Commission study and expertise," when sentencing defendant to 6 months in prison with 12 years of supervised release where guidelines range was 78 to 97 months of incarceration and lifetime supervised release); *U.S. v. McElheney*, 630 F.Supp.2d 886, 895 (E.D. Tenn. 2009) (child pornography guidelines are "due less weight than empirically based Guidelines"); *U.S. v. Stern*, 590 F.Supp.2d 945, 960 (N.D. Ohio 2008) (finding Guidelines "do not reflect the kind of empirical data, national experience and independent expertise that are characteristic of the commission's institutional role" when imposing 12 months and one day incarceration where guidelines called for 46 to 57 months).

The Second Circuit joined these courts in *U.S. v. Dorvee*, 616 F.3d 174.  The *Dorvee* panel's overall critique of the child pornography Guideline includes three components:

- First, a careful examination of the development of the current Guideline leads inevitably to the conclusion that it was the product of a series of underhanded political maneuvers – so-called "morality earmarks" – meant to subvert the normal role of the Sentencing Commission to develop guidelines based on empirical data or rational policy decisions.  *See* Stabenow at 6 and 4-23 (Sen. Jesse Helms' amendment a "morality earmark"; tracing the development of the child pornography Guideline provisions); *U.S. v. Dorvee*, 616 F.3d at 185-86 (describing opposition to amendments from, *inter alia*, the U.S. Sentencing Commission).

- Second, the result of these amendments to the Guidelines is that run-of-the-mill cases of possession are punished at or near the statutory maximum sentence, which was intended for commercial distributors of child pornography, since enhancements based on the number of images, use of a computer and presence of pre-pubescent children and sadistic conduct occur in "nearly all cases[.]" *See U.S. v. Dorvee*, 616 F.3d at 186-87.

- Third, sentences near the statutory maximums for simple possession are unnecessarily high because they are on par with sentences for violent crimes— including, most absurdly, actual abuse of children. *See U.S. v. Dorvee*, 616 F.3d at 187 ("had [defendant] actually engaged in sexual conduct with a minor, his applicable guidelines range could have been considerably lower").

The result of these problems is a Sentencing Guideline that undermines the very foundation of guideline sentencing. As Stabenow points out, in 1997 the mean sentence for child pornography offenders—including not just those that possessed, but also distributors—was 20.6 months.[5]  Ten years later, it was 91.3 months. In other words, the

---

[5] The Stabenow paper cited above is relied upon in *Dorvee* and numerous other cases.  It carefully traces each increase in § 2G2.2, showing that none of them were based on data or analysis, and most were brought about by political manipulations by individual members of Congress.  We urge the Court to consider the paper in its entirety and would be happy to make a copy available upon request.

average sentence increased seven months per year.  There was no rational basis in fact or law for this increase. *See* Stabenow at 2-3.  Rather, it was the result of political maneuvering roundly criticized by the courts, the Sentencing Commission, and former Eastern District of New York United States Attorney Alan Vinegrad, who wrote that one of the legislative changes, the 2003 increase in punishment known as the "Feeney Amendment"—

> was introduced without input from the federal judiciary, the organized bar, academics, criminal justice experts, probation officers or prison officials. Even the Sentencing Commission itself – the very body charged by Congress with the responsibility of creating and amending the Guidelines – was not consulted. ***

> What is more, the proponents of this legislation sought to minimize the opportunity for debate or opposition. The reforms were appended at the eleventh hour to a politically-popular piece of child abduction legislation that no legislator could easily oppose. ***

> The statute evinces, in many ways, extraordinary disrespect for the role that federal district judges play in the sentencing process. ***

> Even more blatant was the rebuke of the Sentencing Commission inherent in this legislation. In enacting this bill, Congress (i) adopted sentencing reforms without consulting the Commission, (ii) ignored the statutorily-prescribed process for creating guideline amendments, (iii) amended the Guidelines directly through legislation, (iv) required that sentencing data be furnished directly to Congress rather than to the Commission, (v) directed the Commission to reduce the frequency of downward departures regardless of the Commission's view of the necessity of such a measure, and (vi) prohibited the Commission from promulgating any new downward departure Guidelines for the next two years.

> *All told, the statute is the most significant effort to marginalize*
> *the role of the Sentencing Commission in the federal sentencing*
> *process since the Commission was created by Congress nearly*
> *20 years ago.*

Alan Vinegrad, *The New Federal Sentencing Law*, 15 Fed. Sent. Rptr.  300, 314-316 (June 1, 2003) (emphasis added, footnotes omitted), *quoted (in part) in U.S. v. Dorvee*, 616 F.3d at 185.

The *Dorvee* court noted that the ill-advised § 2G2.2 enhancements enacted in this way apply in nearly all cases, including this one. *U.S. v. Dorvee*, 616 F.3d at 186.  The court cited 2009 Sentencing Commission data showing that of all sentences under § 2G2.2 in 2009, 94.8% involved an image of a prepubescent minor [triggering a two-level increase under to § 2G2.2(b)(2)], 97.2% involved a computer [two-level increase pursuant to § 2G2.2(b)(6)], 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence [four-level enhancement pursuant to § 2G2.2(b)(4)], and 63.1% involved 600 or more images [five-level enhancement pursuant to § 2G2.2(b)(7)(D)].  *Id.*, *citing* U.S. Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2009*, *available at* http://www.ussc.gov/Data_and_Statistics/ Federal_Sentencing_Statistics/Guideline_Application_Frequencies/2009/09_glinexgline. pdf). Thus, virtually all child pornography receipt cases, starting at base offense level 22, are increased to level 24 and most go up to level 35 as a result of the enhancements.

Most sentences resulting from this flawed process are irrational. As the *Dorvee* court noted, the Sentencing Commission criticized the child pornography Guidelines even before the most recent increases because they failed to distinguish serious commercial

distributors of online pornography from mere users. *Id*. at 186, *citing* U.S. Sentencing Commission, *Report to Congress: Sex Offenses Against Children Findings and Recommendations Regarding Federal Penalties*, June 1996, at 25-30. The Commission found that there was "virtually no distinction between the sentences for defendants [whose activities are limited to viewing images on their computers], and the sentences for the most dangerous offenders, who, for example, distribute child pornography for pecuniary gain and who fall in high criminal history categories." *U.S. v. Dorvee*, 616 F.3d at 187. The punishment of possession of child pornography as harshly as actual child abuse was found to be "fundamentally incompatible with § 3553(a)." *Id*.

As a result of the flaws in the child pornography Guideline, the Second Circuit directed sentencing courts as follows:

> District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 – ones that can range from *non-custodial sentences* to the statutory maximum – bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results. While we recognize that enforcing federal prohibitions on child pornography is of the utmost importance, it would be manifestly unjust to let [a statutory maximum] sentence stand.

*Dorvee*, 616 F.3d at 188 (emphasis added).

Courts in this district and the Eastern District of New York have followed the Second Circuit's direction, increasingly sentencing possessors of child pornography to terms well below the applicable Guidelines. In fact, the median sentence for the 15 child pornography cases brought in the Southern District of New York in 2016 was just 66 months; the year

18

before it was 53 months.  *See* U.S. Sent. Com'n, *Statistical Information Packet, Fiscal Year 2016 Southern District of New York* at 10, Table 7, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2016/nys16.pdf; U.S. Sent. Com'n, *Statistical Information Packet, Fiscal Year 2015 Southern District of New York* at 10, Table 7, *available at* http://www.ussc.gov/sites/ default/files/pdf/research-and-publications/ federal-sentencing-statistics/state-district-circuit/2015/nys15.pdf.  This includes *all* child pornography offenses, many of which carry mandatory minimums of five, ten, or fifteen years. *See U.S. v. Flores*, 14 Cr. 258-1 (RWS), 2015 WL 6656928 (S.D.N.Y. Oct. 30, 2015) (sentence of 24 months despite Guidelines of 51-63 months); *see also, e.g., U.S. v. E.L.*, 188 F. Supp. 3d 152, 155 (E.D.N.Y. 2016) (5 years of probation despite Guidelines of 41 to 63 months)*; U.S. v. R.V.*, 157 F.Supp.3d 207, 223 (E.D.N.Y. 2016) (Weinstein, D.J.) (imposing time-served and seven years probation despite Guidelines sentence of 78-97 months, based on a detailed analysis of federal child pornography sentences).

The more recent statistics provided by Probation specific to people with criminal histories comparable to Mr. Feagins confirm this analysis. The median length of imprisonment was 120 months, the mandatory minimum, and the average length was 103 months for people nationwide in Criminal History Category V and Total Offense Level 28 sentenced under § 2G2.2 from 2017-2021. PSR at 28.[6] It seems clear from this that the

---

[6] Although the PSR does not specify that these 14 sentences were imposed on defendants nationwide as opposed to in the local federal districts, I was able to reproduce the

median length was driven by the 120-month mandatory minimum and that most sentences are substantially below the Guidelines when permitted by the applicable statute.

Recent data available via the Sentencing Commission's Interactive Data Analyzer service, *available at* https://ida.ussc.gov/analytics/saw.dll?Dashboard, reveal that in the Southern and Eastern Districts of New York, the vast majority of child pornography sentences are below the Guidelines. From 2017 to 2021, there were 217 cases in these districts reported to the Commission. Roughly 80 percent of them were sentenced as non-government downward variances, as reflected on the orange line at the top of Exhibit D, which is a chronological graph generated through the Sentencing Commission's statistical tool. In 2021, fewer than 10 percent of child pornography possession defendants (i.e. people sentenced under USSG § 2G1.1) received Guidelines sentences or above. *See* Ex. E.

*** 

Darnell Feagins's crimes are not the worst of child pornography offenses. His past is tragic and his present even more so. It is true, as Probation points out, that he has "failed to benefit from prior terms of imprisonment[.]" PSR at 35. There is absolutely no reason to believe that *additional* imprisonment, beyond the required ten years, will benefit him or society in any way. The Guidelines get it wrong in this case, just as they do in most child pornography cases. He should be sentenced to the minimum term of incarceration authorized by law.

---

analysis by accessing the Sentencing Commission's Judiciary Sentencing Information portal at https://jsin.ussc.gov/analytics/saw.dll?Dashboard and confirm that the total was 14 sentences throughout the United States.

## <u>CONCLUSION</u>

For the reasons set forth above Darnell Feagins should be sentenced to no more than 120 months imprisonment, five years supervised release, and a total special assessment of $100. Due to the nature of the mandatory minimum sentence, we also respectfully request that the Court recommend that the potential pending sentence for the violation of supervised release in 17 Cr. 377 run concurrently with the sentence imposed on this docket.

Dated:  March 30, 2023
New York, New York


Respectfully submitted,
ZMO Law PLLC

By: _____s/_____
     Zachary Margulis-Ohnuma
     353 Lexington Avenue, Suite 900
     New York, NY 10016
     (212) 685-0999